IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| AQUAPOWER, LC, a Utah Limited Liability; and AQUAENERGY. LC, a Utah Limited Liability Company,<br><br>Plaintiffs,<br><br>vs.<br><br>DAVID G. YURTH; NOVA INSTITUTE OF TECHNOLOGY, LLC, a Utah limited liability company; JEFFREY J.. FRANDSEN; SCOTT R. SCHREYER; MICHAEL S. KRALIK; CRIT RANDALL KILLEN; EDWARD G. PRICE; ENVIRONMENTAL POTENTIALS, INC., a Nevada corporation; LEONHARDT SCHROEDTER; ROGER L. CAREFOOT; and JOHN DOES 1-10.<br><br>Defendants. | MEMORANDUM DECISION AND ORDER DENYING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION<br><br>Case No. 2:10-CV-568 TS |

This matter is before the Court on Plaintiffs' Motion for a Preliminary Injunction. A hearing was held before the Court on August 4, 2010. For the reasons discussed below, the Motion will be denied.

## I. Background

The subject matter of this injunction is a technology (the "Hydrogen Generator") that Plaintiffs allege Defendants have or will publicly disclosed in violation of confidentiality agreements. Defendants argue that they own the technology and, therefore, have not disclosed any technology information in violation of the agreements. At both the evidentiary hearing and throughout the briefing, the grievances are focused on the conduct of Defendant Yurth, with little to no allegations regarding the other Defendants.

Plaintiffs allege that, based on confidentiality and consulting agreements signed by each Defendant, they own the Hydrogen Generator, a confidential, proprietary and valuable nano-particle fluid technology that separates water into its constituent hydrogen and oxygen components without the use of electrolysis. Plaintiffs assert that they are the only entity in the world in possession of this technology and that, once commercialized, the technology will give them a competitive advantage in the marketplace.

According to Plaintiffs, sometime around September 2008, they began experimenting with technology to separate molecules contained in the fluids containing nano-particles, into its constituent hydrogen and oxygen atoms. Plaintiffs state that although nano-particles could be separated through hydrolysis, they were interested in developing methods, systems and devices that were more efficient than conventional fluid separating technologies.

Sometime from December 1, 2008, to about January 31, 2009, Plaintiff's allege their Chief Scientific Officer, James Kaiser II ("Kaiser"), developed a working prototype device, known as the "Black Widow," that demonstrated that fluids containing nano-particles could be

separated more efficiently than conventional methods. Plaintiffs allege their scientists already had a heavy workload so they hired a team, lead by Defendant Yurth, to undertake designing a new machine, based on the Black Widow, with improved efficiency. Plaintiffs named this device the K-Gas Generator, but refer to it as the Hydrogen Generator.

Both parties agree that communications with Defendant Yurth began sometime during early August, 2008. Plaintiffs allege these communications dealt solely with their fluids containing nano-particles. On August 15, 2008, Defendant Yurth executed the first of two Confidentiality Agreements ( "First Agreement").[1] The First Agreement states, in pertinent part:

> 5. NNLC [Plaintiffs] is the sole owner of the Confidential Information and any improvements made thereon by NNLC and/or Recipient. This Agreement does not give Recipient any license or other rights in the Confidential Information.[2]

On or about April 26, 2009, Plaintiffs allege they began talking to Defendant Yurth regarding potential employment with Plaintiffs to help improve upon the Black Widow and assist in construction of the Hydrogen Generator. In conjunction with these discussions, Defendant Yurth executed a second Confidentiality Agreement ("Second Agreement").[3] The Second

---

[1]The agreement is between NanoNutrients, L.C. (NNLC) and Defendant Yurth. Although Plaintiffs state a few times in their memorandum that "Plaintiffs and its predecessors developed the technology," they do not ever mention NanoNutrients, or explain the predecessor relationship. Additionally, Plaintiffs state that James Kaiser II, Plaintiffs' Chief Science Officer, has been working on technology relating to Fluids Containing Nano-Particles since 2000 with a company known as More Than H2O. The agreement is signed by Merlin Fish, Plaintiff Aquapower LC's chairman and CEO. However, neither party disputes the agreements are binding on both parties.

[2]Memorandum in Support, Docket No. 25, Ex. 3.

[3]This agreement was also between NNLC and Defendant Yurth. But this agreement is only signed by Defendant Yurth, not by NNLC or any representative thereof. Again, neither party disputes the agreement's force.

Agreement was more particular than the First regarding the Confidential Information and improvements thereon. Specifically, paragraphs 8 and 9 state: that the recipient recognizes Plaintiffs' sole ownership of the Confidential Information, the recipient is not granted any rights or license to the information, and recipient agrees that the Confidential Information and any property developed in relation to or as an extension of the Confidential Information belongs solely to Plaintiffs.[4]

Between April 16, 2009, and July 18, 2009, after Defendant Yurth signed the Second Agreement, Plaintiffs allege they provided access to and supporting technological information of Black Widow to Defendant Yurth. In late July 2009, Plaintiffs allege Defendant Yurth emailed them with a proposed team to be hired to complete the project, compensation for each proposed member, and the proposed tasks for Defendant Yurth and the team to accomplish. The "Hydrogen Generator Team," in addition to Defendant Yurth, consisted of: Defendant Killen, Defendant Price, Defendant Schroedter, and Defendant Carefoot. All team members, except for Defendant Yurth, signed consulting agreements ("Consulting Agreement") with Plaintiffs. A separate consulting agreement and confidentiality agreement was entered into with Defendant Environmental Potentials, Inc. The consulting agreement defined Confidential Information as:

> all financial, accounting, management, legal and computer information concerning the plans, services, programs or business affairs of Nano or the clients of Nano as well as all information disclosed by Nano and the clients of Nano to Consultant which is clearly identified as proprietary or confidential at the time such information comes into the possession or knowledge of Consultant and which is not: *(I) already known to Consultant; (ii) in the public domain*; (iii) conveyed to Consultant by a third party without restriction; (iv) released by Nano or the client

---

[4]Docket No. 25, Ex. 4.

of Nano without restriction; (v) independently developed by Consultant; and (vi) required by Court Order to be released by Consultant. For the purposes of this definition, written information clearly marked as confidential or proprietary and oral information preceded by a statement that such information is confidential or proprietary shall be deemed as "clearly identified as proprietary or confidential." For purposes of this definition, Confidential Information as provided hereunder shall not be Confidential Information ten years after the date such Confidential Information is disclosed by the Disclosing Party to the Receiving Party.[5]

The Agreement goes on to prohibit duplication, use or disclosure of Confidential Information except as permitted under the Agreement; the Agreement permits disclosure to authorized persons only and for the sole purpose of providing services to Nano or its clients.[6] The Agreement states that the Agreement shall not be construed as a license to use the Confidential Information to develop proprietary products or to use any proprietary products resulting from the Confidential Information.[7] The Agreement also includes a covenant not to compete for two years after termination of the Agreement.[8] The Agreement further recognizes that the services to be rendered may result in the development of proprietary and secret information and the like, and that all such proprietary information will belong "solely and exclusively to Nano."[9] The Agreement further prohibits the use or disclosure of such proprietary information, other than for the purposes of the Agreement, for twenty-four months after the

---

[5] *Id.* at Ex. 5, section 1.02 (emphasis added).

[6] *Id.*, sections 4.01-.02.

[7] *Id.*, section 4.03.

[8] *Id.*, section 5.01.

[9] *Id.*, section 6.02.

termination of the Agreement.[10]  Finally, the Agreement states that any proprietary information developed by consultant in performing the Agreement will be deemed a "work for hire," that consultant assigns and conveys any and all ownership and property rights consultant might have or accrue in such proprietary information and will assist Nano in perfecting such rights.[11]

Between April 26, 2009, and January 17, 2010, Defendant Yurth and the Hydrogen Generator Team worked at Plaintiffs' facilities, and were allegedly provided tools, materials and access to Plaintiffs' confidential information to the extent necessary to complete their tasks.

Plaintiffs allege that Defendant Yurth has disclosed Confidential Information in violation of the Confidentiality Agreements and will continue to do so without an injunction.

Defendant Yurth alleges that he has an ownership interest in a part of the intellectual property contained in the Hydrogen Generator, and that he entered the relationship with the technology so that it is not covered by the Confidentiality Agreements.  Defendants do not contest that the technology used by Plaintiffs to create their nano-particle water is both confidential and proprietary.  However, Defendants insist that such technology has not been disclosed to them, and that the disclosures went so far as to acknowledge that the nano-particle water is in existence, which is public information.

## II. Standard of Review

The Tenth Circuit requires a movant to establish four elements as the basis for issuance of a TRO or preliminary injunction: (1) the moving party will suffer irreparable injury unless the injunction issues; (2) the threatened injury to the

---

[10] *Id*.

[11] *Id*.

moving party outweighs any damage to the opposing party; (3) the injunction, if issued, will not be adverse to the public interest; and (4) a substantial likelihood exists that the moving party will prevail on the merits.[12]

When the first three elements are clearly satisfied, the Tenth Circuit has indicated that a more lenient "fair ground for litigation" standard should be substituted for the prerequisite of "a substantial likelihood that the moving party will prevail on the merits."[13] If plaintiff cannot clearly demonstrate that the first three elements are satisfied, then the requirement of substantial likelihood of success on the merits is reviewed under the traditional standard that requires plaintiff to show a reasonable probability of success.[14] However, substantial likelihood of success does not mean the plaintiff must show absolute certainty of success on the merits, nor does it require a showing of "an overwhelming likelihood of success."[15] The main purpose of a preliminary injunction is to preserve the status quo and the power to render a meaningful decision in the case.[16]

"Irreparable harm is determined 'based on such factors as the difficulty in calculating damages, the *loss of unique product*, and existence of intangible harms such as *loss of goodwill*

---

[12] *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991); *Seneca-Cayuga Tribe v. State ex rel. Thompson*, 874 F.2d 709, 716 (10th Cir. 1989); *Tri-State Generation v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir. 1986); accord *Albright v. Board of Educ. Of Granite Sch. Dist.*, 765 F.Supp. 682, 686 (D. Utah 1991).

[13] *Resolution Trust Corp. v. Cruce*, 972 F.2d 1195, 1199 (10th Cir. 1992); *Otero Savings & Loan Association v. Federal Reserve*, 665 F.2d 275, 278 (10th Cir. 1981).

[14] *Atchison, Topeka & Santa Fe Ry. Co. v. Lennen*, 640 F.2d 255, 261 (10th Cir. 1981).

[15] *Id*.

[16] *Id*.

*or competitive market position.*"[17]

### III. Discussion

Plaintiffs have the burden of proving they are entitled to an injunction. Plaintiffs have not met that burden.

Plaintiffs make no allegations relating to the conduct of any Defendant other than Defendant Yurth. Therefore, only Defendant Yurth will be addressed in the remainder of this Order. The Motion will be dismissed as against all other Defendants.

First, as discussed in greater detail below, the Court finds Plaintiffs have not shown a likelihood of success on the merits, without such a finding, they will not suffer irreparable harm. Second, the damage Defendant will suffer is not outweighed by any harm suffered by Plaintiffs. At a minimum Defendant has demonstrated that he is a co-owner of the Hydrogen Generator. As a joint owner of an invention, each owner may, absent any agreement to the contrary, fully use the invention "without the consent of and without accounting to the other owners."[18] If the Court were to grant the injunction it would be denying Defendant a right to use his property at all, whereas Plaintiffs appear only to face a possible loss in some, non-concrete, value of their property. Third, the public interest factors weigh in Defendant Yurth's favor because it is against the public interest to restrain an owner from using his property absent extraordinary circumstances which are not present here. The Court finds that Plaintiffs have not established the

---

[17] *Clearone Commc'ns, Inc. v. Chiang*, 608 F.Supp.2d 1270, 1279 (D. Utah 2009) (quoting *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1264 (10th Cir. 2004)).

[18] 35 U.S.C. § 262.

first three elements required for a preliminary injunction, therefore, the likelihood of success element is reviewed under the traditional standard.

Plaintiffs allege fifteen claims in their Complaint, however the only three addressed in this Motion are: ownership, confidentiality, misappropriation and Lanham Act claims. Moreover, the only claim upon which any evidence has been presented is based on the two confidentiality agreements. Therefore, the Court will not address the likelihood of success of the remaining claims.

Plaintiffs maintain they are the owners of the Hydrogen Generator technology at issue and, as such, have the right to make any material decisions about the Generator, including those relating to patents, disclosure of confidential information and trade secrets, and investments. Plaintiffs argue they will succeed on the merits of this determination due to 1) the confidentiality agreements executed by Defendant Yurth, 2) the fact that Defendant Yurth was hired and paid by Plaintiffs for the express purpose of building a prototype for the Hydrogen Generator technology, and 3) that, under any reading of the facts, Plaintiff will be an owner of the Hydrogen technology because Kaiser, Plaintiffs' Chief Scientific Officer, is either the sole inventor or at least one of the inventors of the Hydrogen Generator technology because it is based directly from Black Widow technology invented solely by James Kaiser.

Defendant Yurth acknowledges that he signed two confidentiality agreements but maintains Plaintiffs failed to identify what "the Confidential Information" encompassed, what was actually disclosed to and subsequently used by him. Defendant further asserts that he began to conceive of the Hydrogen Generator on April 20, 2008, and that he, therefore, came into the

relationship with knowledge and a conceptual design of the Hydrogen Generator. Consequently, he argues, the device is exempted from the Agreements based on the definition of Confidential Information and the exclusion clauses recognizing that information already known or publicly available cannot be included in the definition of Confidential Information.[19]

Similarly, Defendant asserts that he submitted a proposal to Plaintiffs for prototype production of the Hydrogen Generator that he had previously designed.[20] Therefore, he argues, he could not have been hired to develop something he hard already developed.

Finally, Defendant refutes the proposition that the Hydrogen Generator is based off the Black Widow and instead proffers that it is a completely separate machine. Even if the Hydrogen Generator was based off the Black Widow, the parties would be joint owners and have equal right to control the invention. Additionally, the parties agree that the composition of and technology behind the nano-particulated water is confidential and proprietary information belonging to Plaintiffs. Defendant Yurth asserts, however, that information regarding the nano-particulated water, other than its existence, has never been disclosed to him.

Based on these disputes the Court finds that Plaintiffs have not met their burden of showing that they are likely to succeed on the merits.

---

[19] Docket No. 25, Ex. 3 ¶ 2, Ex. 4 ¶ 2.

[20] In his email proposal, dated July 18, 2009, Defendant Yurth wrote, "I'll provide a high level summary of the design I intend to use to produce. . ." The email goes on to provide a summary of the design. Declaration of David Yurth, Docket No. 39, Ex. 3; *see also* Ex. 4 (In a separate email to Plaintiffs in regards to the consulting agreement, Defendant Yurth states, "What I do NOT want is for concepts and ideas I have already spent years of research developing to become so entangled by this controversial language . . .)

## IV. Conclusion

Based on the above, it is hereby

ORDERED that Plaintiffs' Motion for a Preliminary Injunction (Docket No. 24) is DENIED.

DATED   August 24, 2010.

BY THE COURT:

_____
TED STEWART
United States District Judge